# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### November 28, 2001 Session

## STATE OF TENNESSEE v. DARRELL M. SCALES

**Appeal from the Criminal Court for Davidson County**
**No. 99-C-1665     Seth Norman, Judge**

---

**No. M2000-03150-CCA-R3-CD - Filed Janaury 11, 2002**

---

The Defendant, Darrell M. Scales, was convicted by a jury of three counts of aggravated robbery and three counts of aggravated sexual battery. The trial court subsequently sentenced the Defendant to nine years on each of the robberies and to nine years on each of the sexual batteries. The court ordered the sentences to be run partially consecutive, for an effective sentence of twenty-seven years. In this appeal as of right, the Defendant raises the following five issues: (1) whether the trial court erred by refusing to suppress identification testimony; (2) whether the evidence is sufficient to support his convictions; (3) whether the trial court erred in failing to require the State to elect from two separate incidents of aggravated sexual battery against one of the victims; (4) whether the trial court erred in failing to charge the jury on lesser-included offenses of aggravated sexual battery; and (5) whether the trial court erred in ordering partially consecutive sentences. We hold that the trial court committed reversible error when it failed to require the State to elect offenses, and that it committed reversible error when it failed to instruct the jury on all lesser-included offenses of aggravated sexual battery. Accordingly, we reverse and remand for retrial the Defendant's convictions for aggravated sexual battery. In all other respects the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Jeffrey A. DeVasher, Nashville, Tennessee, for the appellant.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Rossie D. Sherrell testified that, on January 28, 1999, the Defendant, a man he had known for several years, approached him about getting some money to support Sherrell's cocaine addiction. Sherrell agreed to cooperate. The Defendant drove Sherrell to the Steel Mill in Nashville, an adult entertainment business. The Defendant wanted Sherrell to "case" the business, after which the Defendant planned to rob it.

According to Sherrell, he knocked on the Steel Mill's door and gained entrance. He spoke with the employees, then returned to the Defendant's car and told the Defendant what he had learned. The Defendant told him to go back to the door. Sherrell did so and as he was speaking to one of the employees in the doorway, the Defendant and another man pushed Sherrell into the business and came in behind him. The Defendant told Sherrell to lie on the floor and Sherrell complied. Eventually, Sherrell left with the Defendant and the third man, and was paid $200 for his participation in the crime. Sherrell testified that he did not know the third man's identity, and that this unidentified man had arrived at the scene in a different car.

Three women were working at the Steel Mill that night, Ms. Ronda Begley, Ms. Jessica Crowell, and Ms. Leah Blair. Each of the women testified at trial. Their testimony established that, at about 10:30 on the night of January 28, 1999, the doorbell rang. Rossie Sherrell and another man were admitted and began asking a lot of questions about the business. Mr. Sherrell asked to use the restroom; Ms. Blair continued to speak with the other man while Mr. Sherrell went to the bathroom. The two men then left. A few minutes later, the doorbell rang again. Mr. Sherrell was at the door, asking questions about the location of another adult business. Mr. Sherrell was then pushed into the lobby from behind by the Defendant and yet another man, both of whom were carrying handguns. The Defendant was wearing wire-rimmed glasses, black leather gloves, a leather jacket and a hat. The other gunman was wearing latex gloves. The Defendant pointed the gun at Ms. Begley and told her to get down on the floor. He also pointed the gun at Ms. Blair, telling her to get down. He then told both women to disrobe. Both women removed their outer garments, leaving on their underwear. Mr. Sherrell was also told to lie on the floor with them. The Defendant closed the blinds in the lobby and ripped out the phone.

While the Defendant was dealing with the people in the lobby, the other gunman went to one of the "session" rooms and retrieved Ms. Crowell and her male customer. They were both brought to the lobby and ordered to lie on the floor. The Defendant told Ms. Crowell to undress; she took off her shirt but left her jeans on. The other gunman went through the other rooms in the business, ransacking the contents and putting items in a duffle bag. The Defendant stayed in the lobby making sure that everyone stayed on the floor.

Ms. Begley testified that, while she was on the floor in the lobby wearing nothing but her underwear, the Defendant "grabbed [her] buttocks as though he was searching [her.]" Ms. Blair testified that the Defendant also touched her as she lay on the floor. She stated that the Defendant touched her between her legs, over her panties, "for a brief moment," and complemented the tattoo she had on her back. Ms. Crowell testified that, while she was laying on the floor, the Defendant

ran his hand up her leg to her crotch area. The Defendant continued to hold his gun while he touched the victims.

During the robbery the doorbell rang again. The Defendant ordered Ms. Crowell to answer the door; the other gunman took everyone else into another room. The Defendant accompanied Ms. Crowell to the front door, keeping the gun in her side. She told the visitor to leave. The Defendant then accompanied Ms. Crowell to the room where the others were. Ms. Crowell testified that the Defendant "had his hands on [her] butt" while they walked from the front door to the room. Once there, the gunmen asked where the house money was kept. Ms. Blair showed them the appointment book where the Steel Mill's cash and receipts were kept. The men took the book, together with other property that they had gathered from the rooms and from the customer, and left with Sherrell. At some point, the customer also left. The women called the police a few minutes after the robbery was over.

The robbery lasted about twenty minutes. Ms. Begley testified that she had been able to see the Defendant's face "[a] good fifteen minutes" of this time, and that the lighting had been good. Ms. Crowell stated that the Defendant had seemed to be in charge of the robbery, that he had told the other man what to do. She described him as a black man, but having a lighter complexion than the other man, and she said he wore wire-rimmed glasses. She explained that the entire episode lasted twenty to thirty minutes, and that she looked directly at the Defendant for five to six of those minutes. Each of the women testified that she had been scared. Ms. Begley testified that the gunmen stole her pager and some jewelry. Ms. Crowell testified that they stole $700 cash that she had. Ms. Blair testified that the robbers took her purse containing her credit card and between $120 and $150 in cash.

Each of the women was interviewed separately at the scene by Detective Wilbur Nesbitt. They each gave the detective a physical description of the men involved. A day or two later, each of the women went to the police station to review photographs, but none of them was able to make an identification. Detective Nesbitt testified that, to his knowledge, the photographs reviewed by the women did not include photographs of either the Defendant or Sherrell. About a month later, Detective Nesbitt received a report of two men who had been "field interviewed" at another adult entertainment establishment. The description of one of these men matched the description of the Steel Mill robber who had been wearing glasses. Detective Nesbitt determined that this man was the Defendant. Detective Nesbitt prepared a photographic lineup containing the Defendant's photograph and showed it to Ms. Begley. He testified, "[a]s soon as [he] gave [Ms. Begley] the lineup her hand started trembling and she started shaking, and she pointed to [the Defendant] and said, 'That's him right there, the one with glasses.'" Detective Nesbitt stated that Ms. Begley identified the Defendant in "a matter of seconds." At trial, Ms. Begley testified that she had no doubt about her identification, that she had "a good look" at the Defendant, and that she had "recognized him by his eyes." Ms. Begley reidentified the Defendant at trial as the man who had pointed the gun at her and touched her as she lay on the floor.

Detective Nesbitt next showed the lineup to Ms. Crowell, who was at a different location. She also identified the Defendant. The next day, Detective Nesbitt visited Ms. Blair. For this victim, Detective Nesbitt created a new lineup, using a different photograph of the Defendant and

placing it in a different position within the lineup. Upon reviewing the lineup, Ms. Blair identified the Defendant. Both of these women also identified the Defendant at trial as their attacker.

Detective Nesbitt testified that he also showed each of the women a lineup containing a photograph of Mr. Sherrell, and that each of the women identified him. Detective Nesbitt stated that the second gunman in the robberies remained unidentified.

## IDENTIFICATION TESTIMONY

In his first issue the Defendant contends that the trial court should have suppressed the victims' identification testimony of the Defendant as the perpetrator, arguing that "the pretrial identification procedures upon which these witnesses' identifications were based were unduly suggestive and unreliable" because his "photograph stands out in a suggestive manner" in both lineups. The Defendant complains that, in the photographic lineup shown to Ms. Crowell and Ms. Begley, he is "the only person who is not looking at the camera, and is wearing bright gold clothing that is dissimilar to that worn by the other participants in the lineup." As to the lineup shown to Ms. Blair, the Defendant states that his photograph "is the most distinct, and the least blurry." As to both lineups, he suggests, his "distinctive eyes -- his right eye appears larger and more round than his left eye -- are dramatically different in appearance than the eyes of any of the other participants whose photographs appear in the lineups." In support of his argument the Defendant relies on the Supreme Court case of Simmons v. United States, 390 U.S. 377 (1968), which states that a pretrial photographic identification procedure must not be "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Id. at 384. Where the identification procedure is unduly suggestive, the totality of the circumstances surrounding the identification must be examined to determine whether the identification is nevertheless sufficiently reliable to satisfy due process. See Neil v. Biggers, 409 U.S. 188, 199 (1972).

The trial court denied the Defendant's pretrial motion to suppress the eyewitness identifications. Our standard of review on a motion to suppress where the evidence does not involve issues of credibility is de novo without a presumption of correctness. See State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000). The evidence involved in this issue is the photographic arrays themselves, which involve no issues of credibility and which this Court is just as capable of reviewing as the trial court. See id. Thus, we review the complained-of lineups de novo without a presumption of correctness in order to determine whether they were "impermissibly suggestive."

We find that they were not. As previously noted by this Court, "a lineup would be considered unduly suggestive . . . when the other participants were grossly dissimilar." State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993), citing United States v. Wade, 388 U.S. 218, 233 (1967) (emphasis added). No such gross dissimilarity exists here. In the photo array shown Ms. Blair, all six men are of similar age and have similar haircuts and facial hair. All have black hair and brown eyes. All but one of the men -- not the Defendant -- have similar darkness of complexion. Three of the men, including the Defendant, are wearing black; two of the men are wearing white, and one is wearing orange. One of the photographs -- not of the Defendant-- is slightly out of focus. Three of the men -- one of whom is the Defendant -- have eyes of noticeably different sizes. All of the men are looking directly at the camera, and all of the photographs are

mugshots.  Similarly, in the array shown to Ms. Begley and Ms. Crowell, all six men are again of similar age and have similar haircuts and facial hair.  All of the men have black hair and brown eyes. Their complexions vary somewhat.  Two of the photographs -- including the Defendant's -- are slightly out of focus.  The Defendant, unlike the other men, is looking somewhat below the camera lens.  Two men are wearing black, two men are wearing white, the Defendant is wearing yellow and another man is wearing orange.  The eyes of the Defendant and one other man appear slightly dissimilar.

In short, the Defendant does not "stand out" in any fashion in either of the arrays.  Where the lineups are not unduly suggestive, it is not necessary to proceed to the next step in the analysis and determine whether the identification is nevertheless reliable.  See State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990); State v. Mosley, 667 S.W.2d 767, 770 (Tenn. Crim. App. 1983).  This issue is without merit.

## SUFFICIENCY OF THE EVIDENCE

The Defendant next challenges the sufficiency of the evidence in support of his convictions. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."  Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000).  In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom."  Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279.  The court may not "re-weigh or re-evaluate the evidence" in the record below.  Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105.  Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment.  Tuggle, 639 S.W.2d at 914.  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

We first address the Defendant's three aggravated robbery convictions.  The Defendant contends that the evidence is not sufficient to establish his identity as one of the perpetrators. This issue is without merit.  The Defendant's three female victims positively identified him in court and one of his accomplices also identified him in court.  As set forth above, the identification testimony

was properly admitted at trial. Thus, evidence of the Defendant's identity was more than sufficient. The other elements of the crime were also supported by sufficient evidence. Aggravated robbery is committed when the accused intentionally or knowingly commits a theft of property from the person of another by violence or putting the person in fear, accomplished with a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1). The evidence in this case established overwhelmingly that the Defendant participated in the theft of Ms. Blair's, Ms. Begley's and Ms. Crowell's property as he held them at gunpoint in their place of employment. All three victims testified as to their fear. The evidence supports the Defendant's three convictions of aggravated robbery, and this issue is therefore without merit.

We also find the evidence sufficient to support the Defendant's convictions of aggravated sexual battery against Ms. Begley and Ms. Blair.[1] That crime is committed when the accused has unlawful sexual contact with the victim where force or coercion is used to accomplish the act and the accused is armed with a weapon. See Tenn. Code Ann. § 39-13-504(a)(1). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6). "Intimate parts" is defined as including "the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2). Both Ms. Begley and Ms. Blair testified that the Defendant ordered them to strip, and then touched them either between their legs or on their buttocks.

The Defendant contends that he touched the women "to determine whether any of the victims were concealing a weapon or valuables on their person." While we acknowledge that Ms. Begley described the Defendant's actions as "grabb[ing] [her] buttocks as though he was searching [her]," her explanation that she was wearing only thong underwear at the time undercuts the Defendant's theory. Thong underwear leaves the wearer's buttocks uncovered and unamenable to concealing a weapon there. With respect to the Defendant's touching of Ms. Blair, Ms. Begley testified that when she saw the Defendant touching Ms. Blair between her legs, she became convinced that they were going to be raped. Clearly, Ms. Begley discerned something in the Defendant's manner of touching Ms. Blair that suggested sexual contact as defined by the statute. Moreover, the Defendant did not order either Mr. Sherrell or the customer to strip, nor did he "search" either of these men. Accordingly, we find that the proof was sufficient for the jury to have reasonably construed that the Defendant's touching of Ms. Begley and Ms. Blair was done for the purpose of sexual arousal or gratification. This issue is, therefore, without merit.

## ELECTION OF OFFENSES

---

[1] As set forth later in this opinion, the State adduced proof at trial of two instances of aggravated sexual battery against Ms. Crowell, but did not elect upon which offense it was seeking a conviction. Because we reverse the Defendant's conviction of aggravated sexual battery against Ms. Crowell due to the State's failure to elect offenses, and because we cannot determine upon which of the two instances of conduct the jury convicted, we decline to address the sufficiency of the evidence supporting the aggravated sexual battery conviction as committed against Ms. Crowell.

The Defendant next contends that the trial court committed plain error when the court failed to require the State to elect which offense of aggravated sexual battery it wanted the jury to consider with respect to Ms. Crowell. The State concedes that the trial court committed plain error in this regard, and we agree. Accordingly, the Defendant's conviction of aggravated sexual battery against Ms. Crowell is reversed and remanded for a new trial.

The proof at trial established that the Defendant touched Ms. Crowell's "intimate parts" on two separate occasions: first, when he ran his hand up between her legs as she lay on the floor, and second, when he put his hand on her buttocks as she returned from answering the door and dismissing the visitor. When an accused is indicted for a single offense, but the State proves multiple commissions of the offense, the State is required to elect upon which offense it is relying for a conviction. See State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). This doctrine of "election of offenses" is necessary to protect the accused's right under the Tennessee constitution to a unanimous jury verdict. See Shelton, 851 S.W.2d at 137. In this case, the Defendant was charged with one instance of aggravated sexual battery against Ms. Crowell. The State proved two instances of such conduct against Ms. Crowell, but did not elect upon which instance it was seeking a conviction. Such failure requires reversal of the conviction. See id. at 139. Accordingly, the Defendant's conviction of aggravated sexual battery against Ms. Crowell is reversed and remanded for a new trial.

## LESSER-INCLUDED OFFENSES

In his fourth issue the Defendant contends that misdemeanor assault is a lesser-included offense of aggravated sexual battery, and that the trial court committed reversible error in not charging the jury on that offense. We must agree, and therefore reverse the Defendant's convictions for aggravated sexual battery and remand those charges for a new trial.

A trial court is under the mandatory duty to instruct the jury on a lesser-included offense, even if such an instruction is not requested, when "any evidence exists that reasonable minds could accept as to the lesser-included offense" and when that evidence is "legally sufficient to support a conviction for the lesser-included offense." State v. Burns, 6 S.W.3d 453, 469 (Tenn. 1999); see also Tenn. Code Ann. § 40-18-110(a). In Burns, our supreme court adopted a new three-part test for determining whether an offense is a lesser-include offense. See Burns, 6 S.W.3d at 466-67. Under the new test, which was largely derived from the Model Penal Code, an offense is a lesser-included offense if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>> (1) a different mental state indicating a lesser kind of culpability; and/or
>> (2) a less serious harm or risk of harm to the same person, property or public interest; or
> (c) it consists of

> (1) facilitation of the offense charged or of an offense
> that otherwise meets the definition of lesser-included
> offense in part (a) or (b); or
> (2) an attempt to commit the offense charged or an
> offense that otherwise meets the definition of lesser-
> included offense in part (a) or (b); or
> (3) solicitation to commit the offense charged or an
> offense that otherwise meets the definition of lesser-
> included offense in part (a) or (b).

Id.

As set forth above, the elements of aggravated sexual battery are unlawful sexual contact with the victim, accomplished by force or coercion, where the accused is armed with a weapon. See Tenn. Code Ann. § 39-13-504(a)(1). Sexual contact occurs when the accused intentionally touches the victim's intimate parts (or the clothing covering the victim's intimate parts) and the touching can be reasonably construed as being for the purpose of sexual arousal or gratification. See id. § 39-13-501(6). Class B misdemeanor assault is committed when the accused "[i]ntentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative." Id. § 39-13-101(a)(3). In addressing the issue of whether Class B misdemeanor assault is a lesser-included offense of aggravated sexual battery, our supreme court recently concluded that this form of misdemeanor assault is a lesser-included offense of aggravated sexual battery under part (b)(2) of the Burns test. See State v. Swindle, 30 S.W.3d 289, 293 (Tenn. 2000). Accordingly, we must now determine whether the evidence justified a jury instruction on Class B misdemeanor assault.

In its charge to the jury, the trial court gave instructions on the following lesser-included offenses of aggravated sexual battery: facilitation to commit aggravated sexual battery; sexual battery; and facilitation to commit sexual battery. All of these offenses require that the victim be subjected to unlawful sexual contact, as defined supra. That is, all of these offenses required the jury to have found that the victims were touched on their intimate parts for the purpose of sexual arousal or gratification. The proof at trial was uncontroverted that the Defendant touched each of the female victims on their "intimate parts." The question for our determination, then, is whether "any evidence exists that reasonable minds could accept" that the Defendant touched the victims' intimate parts for some reason other than sexual arousal or gratification. Burns instructs us that, in answering this question, we "must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence." Id., 6 S.W.3d at 469.

We hold that, given the proof in this case, the jury could have reasonably concluded that the Defendant touched the victims in the manner that he did for reasons other than sexual arousal or gratification. For instance, the Defendant may have been trying to frighten and/or intimidate the victims; he may have been "counting coup" in some fashion; he may have been harassing the women simply because he was in a position to do so. The Defendant himself contends on appeal that he was

"searching" the women for weapons or valuables. Any of these reasons – or any of a myriad of other reasons -- would have supported a conviction of Class B misdemeanor assault. Thus, the trial court erred in failing to instruct the jury on this lesser-included offense of aggravated sexual battery.[2]

Having determined that the trial court erred in its jury charge, we must now decide whether the trial court's error is harmless beyond a reasonable doubt. See State v. Ely, 48 S.W.3d 710, 727 (Tenn. 2001) (holding that, "when determining whether an erroneous failure to instruct on a lesser-included offense requires reversal, . . . the proper inquiry for an appellate court is whether the error is harmless beyond a reasonable doubt.") We hold that it was not. As set forth above, all of the offenses with which the jury was charged relative to the Defendant's touching the victims required that the touching satisfy the definition of sexual contact. Although the proof would have supported a finding that the touching was simply extremely offensive or provocative, the jury was erroneously precluded from drawing this conclusion. Thus, we cannot find that the trial court's error in this regard was harmless beyond a reasonable doubt. Cf. id. (finding that, where the evidence was sufficient to support a conviction of second degree murder, reckless homicide, or criminally negligent homicide, but the jury was given no option to convict of a lesser offense than felony murder, the failure to instruct on the lesser-included offenses was not harmless beyond a reasonable doubt). See also State v. Bowles, 52 S.W.3d 69, 80 (Tenn. 2001) (finding that the trial court's error in failing to charge theft as a lesser-included offense of robbery was not harmless beyond a reasonable doubt where the jury had no opportunity to consider an intermediate lesser-included offense). We reluctantly conclude, therefore, that we must reverse the Defendant's convictions for aggravated sexual battery and remand those charges for a new trial.

## CONSECUTIVE SENTENCING

In his final issue the Defendant contends that the trial court erred in ordering that he serve two of his sentences consecutively to each other and to the remaining four sentences, which were run concurrently, for an effective sentence of twenty-seven years.[3] We note first that the Defendant's sentences for the aggravated robberies were all run concurrently. Two of the aggravated sexual battery sentences were run consecutively to each other and to the remaining sentences. Because we are reversing the Defendant's convictions for aggravated sexual battery, the only sentences remaining in effect are concurrent. However, if he is convicted upon retrial, the Defendant will again be subject to evaluation for consecutive sentences. Accordingly, we deem it appropriate to review the trial court's determination that the Defendant qualifies for consecutive sentencing.

---

[2] We also note that where, as here, the accused is armed with a gun while he touches the victims, aggravated assault as defined in Tennessee Code Annotated section 39-13-102(a) is also a lesser-included offense of aggravated sexual battery.

[3] The Defendant was sentenced as a Range I standard offender to nine years on each of the six convictions. The Defendant does not challenge the length of his sentences.

The Defendant argues that the trial court erred in finding him to be a "professional criminal"; an "offender whose record of criminal activity is extensive"; and a "dangerous offender," so as to justify consecutive sentences. See Tenn. Code Ann. § 40-35-115(b)(1), (2), (4). When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a de novo review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Brewer, 875 S.W.2d 298, 302 (Tenn. Crim. App. 1993); State v. Thomas, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Pike, 978 S.W.2d 904, 926-27 (Tenn. 1998); State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In determining the Defendant to be subject to consecutive sentencing, the trial court first found that the Defendant is "a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood." Tenn. Code Ann. § 40-35-115(b)(1). The trial court based this finding on the Defendant's four misdemeanor gambling convictions, stating, "I certainly think that one could construe convictions for gaming as one attempting to make a livelihood by wagering." While we agree with the general tenor of the trial court's remark, we respectfully disagree that there was sufficient proof in this case that the Defendant's criminal acts served as a major source of his livelihood. The is no proof in the record as to the amounts of money the Defendant wagered, and no proof that he actually won any money at his gambling attempts. His other criminal acts, as set forth in the presentence report, include convictions for driving with a revoked license; larceny, auto; criminal impersonation; theft of property under $10,000; resisting a stop; criminal trespass; aggravated assault; and driving on a suspended license. There simply is no proof in the record that the Defendant obtained a major source of his livelihood from this series of criminal acts. Accordingly, the trial court erred in ordering consecutive sentences on the basis that the Defendant is a "professional criminal."

The trial court also found that the Defendant was subject to consecutive sentences on the basis that his record of criminal activity is "extensive." See id. § 40-35-115(b)(2). We agree with the trial court in this regard. At the time the presentence report was prepared, the Defendant was

-10-

twenty-nine years old. Beginning at age twenty-one, the Defendant had compiled a list of nineteen convictions by the time of sentencing, not including the present convictions. He also has numerous arrests, including a murder charge, for which no convictions were obtained. While most of the Defendant's prior convictions are for misdemeanors, their number and variety satisfy the meaning of "extensive." Cf. State v. Pettus, 986 S.W.2d 540, 545 (Tenn. 1999) (the defendant's prior record of two thefts, an unlawful weapons conviction, contributing to the delinquency of a minor, and driving on a revoked or suspended license was sufficient to support consecutive sentences on the basis that the defendant's record of criminal activity was extensive). Imposition of partial consecutive sentencing is therefore justified on this basis.

The trial court also found that the Defendant is a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). In deciding to so classify the Defendant, the trial court stated, "When you enter into a business and line all of the customers and employees up, and do what these people did, I don't see how the Court could say that it wasn't a risk to human life in this situation." We agree that the Defendant's actions in this case indicated little or no regard for human life, and no hesitation about committing the crimes when the risk to human life was high. Indeed, the Defendant sent Mr. Sherrell in to check the business out before the robbery, so the Defendant knew that there were at least two women inside. Nevertheless, the Defendant carried out his plan to enter the business armed, with an armed cohort. Once inside, the Defendant closed the blinds, disabled the phone, and ensured the dismissal of a potential rescuer, thereby effectively eliminating any help for the victims and increasing their danger.

However, before a defendant can be subjected to consecutive sentences on a finding that he or she is a dangerous offender, the proof must also establish that the sentence imposed is reasonably related to the severity of the offenses committed, and is necessary in order to protect the public from further criminal acts by the offender. See State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). The trial court in this case did not address these two prerequisites. Nevertheless, we hold that the record establishes these requirements. The Defendant deliberately walked into a business in which he knew at least two women were working. He carried a gun and was accompanied by another gunman. He took actions to prevent the victims from obtaining help. He held five people at gunpoint for at least twenty minutes. He physically assaulted the women while holding them at gunpoint. These offenses are severe. The Defendant's extensive history with law enforcement has not deterred him from continuing to commit dangerous and life-threatening crimes. The consecutive sentences imposed in this case were appropriate, and we find no error in the trial court's imposition of an effective twenty-seven year term. This issue is without merit.

## CONCLUSION

The Defendant's convictions for aggravated sexual battery are reversed and remanded for a new trial. In all other respects, we affirm the judgment of the trial court.

-11-

_____
DAVID H. WELLES, JUDGE